First case, in re Marriage of Houghton. Counsel, you're first. The facts of this case briefly stated are that the parties were married in November of 1984. They were divorced June 25th, 2004. The judgment dissolving the divorce did not dissolve the property issue. During the course of the marriage in approximately November of 2003, the respondent, Mr. Shelton, wrote a 40-page text which was completed and was circulated to some of his associates. The intent of the 40-page text was that it would be published as a pamphlet on its own. Mr. Shelton had published such pamphlets previously. In May, May 24th precisely, of 2004, he gave a copy of that text to Shelly Quinn, who was a published author. Ms. Quinn read the text on her own as a volunteer, without any discussion or permission from Mr. Shelton, without any contract or any promise of remuneration, undertook to do some rewriting. When she did that rewriting and she showed it to Mr. Shelton, he approved of it. Ultimately, after the marriage, the rewriting led to the creation in September of 2004 of a book titled The Antichrist Agenda. That book did not exist prior to its compilation in its publishable form on September 14th of 2004. When you say it didn't exist, it didn't exist in its final format, but it had been drafted? The drafts of the book started in July. We've provided in the supplemental record, Your Honor, the various drafts that Ms. Quinn went through and circulated during the writing process. Those notebooks, which are exhibits, show that she started circulating those redrafts of the book roughly in July of 2004, but again, that's about a month after the marriage was terminated. The point made both by the trial court and is apparent in the facts of the case that all of that work was done by Ms. Quinn, not by the respondent. The respondent did no work on this rewrite. The respondent did no work on any cognizable work, literary work in this case, except for the original 40-page text. The book ultimately entitled Antichrist Agenda was printed commercially in December of 2004. There was subsequent to that in May of 2005 a publication contract entered into between Remnant Publishing Company and DLS, Respondent's Postmarital Corporation, in which royalties for the first time were paid for Antichrist Agenda. At about that time or a little later, the publisher comes to DLS, to the respondent, and suggests that if they could abridge the book, because Agenda was about 200 pages long, if they could abridge the book to 100 to 120 pages, the publisher thought it could be sold at Walmart. Ms. Quinn undertook an abridgement of the book, again without any contribution from respondent. She did that in the summer of 2005, which ultimately resulted in a work entitled Ten Commandments Twice Removed, which was then the subject of a separate publication contract in October of 2005. And that book then was ultimately sold and royalties were generated. The only two works here that royalties were generated for was both Agenda and Ten Commandments. This case is before the court on a certified question from the trial court since Supreme Court Rule 308. The question is, in an Illinois dissolution of marriage proceedings, can a court divide as marital property the royalties received after the date of dissolution by an author's spouse, pursuant to a publication contract executed after the date of dissolution, when the underlying literary work was not in final form and had not been published as of the date of dissolution? The answer to that question is no. This question seems to me to presume that the literary work that's referenced here was the subject of the contract. The literary work, there are three separate literary works, and this is the point, this is the fallacy in my view of the petitioner's petition, because it assumes all the way through that somehow this keeps morphing this one work that was existing during the marriage. The 40-page text keeps somehow morphing into something else, and that it's a continuum. That's not true. But do you agree that this question presumes that? The question presumes that. The question, I think, doesn't reflect the facts of the case. Well, do you think that it's an all-or-nothing proposition? In other words, can a book become, that started pre-marriage and then evolves, can it be partly marital property? I think, under the facts of this case, it cannot. But do you think in the legal world that it can be a part? Is it an all-or-nothing? And I think the answer to the question is this. I think you have to look at the Copyright Act, because the Copyright Act takes precedence on that. And I read your argument on that, and I read about the derivative works and how derivative works are all entitled to their own copyright, and I understand all of that. But my question is, what you want us to answer, it seems to me, presumes that the literary work, which was not in final form, was the subject of the contract. Well, and the point of the matter is, in this case, the literary work, which was not in final form, was not the subject of a contract. But you would agree that, reading the question, right? Yes, I would. There is a presumption in the question. Okay. And my point about that, and this gets to what I think is the fundamental difficulty that the petitioner has in assuming that there was some contract that related to a literary work that existed during the marriage. There isn't. But could you have a book in final form that is one quarter made during the marriage, theoretically? The argument made by the petitioner is that you can, and they cite a Louisiana case that they say says that. The reason that I think that that argument is fallacious is because the Louisiana case, if you look at it, the Louisiana case he cites, which is the Michael case, analogizes the unfinished book to a largest contingency fee contract. It then cites a specific Louisiana case that says that a largest contingency fee contract under Louisiana law is divisible in the marriage. That is 180 degrees the opposite of the law in Illinois. In Illinois, the Supreme Court, in the case of the in-ring marriage of Zales, says that contingency fee contracts are not divisible. So the principle of law on which he relies is not the law of Illinois. And I submit to you that looking at the principles of the law of Illinois and looking at the Copyright Act, I think, Your Honor, that you can't get there from here. And the reason that I say that to you is because the Copyright Act controls. It's preeminent here. It predominates. The difficulty is if you look at Section 101 of the Copyright Act, Section 101 of the Copyright Act defines when a work is created. And I'm sorry to interrupt you, but what about the Copyright Act do you think preempts Illinois dissolution law? Section 301 of the Copyright Act says so very specifically. That it intends to cover the entire field. It covers the field. Is there a property division? No. What it covers is when, if, and to whom a copyright approves. It covers, it preempts those things which it covers. If you look at the Rodriguez case, which we've cited, the Rodriguez case defines what it covers and what it doesn't. What this Court cannot do, this Court cannot determine, for example, what a copyright attaches to a piece of work. I just, I personally don't see how a copyright is relevant here. Well. Because there was no copyright for the original literary work that's in the question. Well, and my submission to you, Judge, is that's mistaken. And the reason I say that's mistaken is a copyright attaches to any work on the instant it's reduced into a tangible form. So on the 40-page text that Mr. Shelton wrote, when he pushed the print button and that copyright, and that thing was printed, a copyright attached to it under Section 102 of the Copyright Act. If you look at Section 101 of the Copyright Act, when it defines when a work is created, what it says is that the work is created when it's reduced to a tangible form. And then it talks about exactly the question Your Honor poses when it says, well, what if it's partially complete or what if it's in one of its versions? Section 101 of the Act says a work is created when it is fixed in a copy for the first time. Where it is prepared over a period of time, i.e. partially complete, the portion of it that has been fixed at any particular time constitutes the work as of that time. And where the work has been prepared in different versions, each version constitutes a separate work. So the answer to Your Honor's question is that the portion of the work completed at any time is the work, and it's subject to its own copyright. So the portion that was completed by Mr. Shelton was subject to its own copyright. It is subject to its own copyright. So it is divisible. Yes, ma'am, it is. Because it is a separate and independent work. And this is where you get into what the court decided, what the U.S. Supreme Court decided in January in the case of Mathis. The Mathis case determined that consistent with holdings in this state for years and years, including the holding of this court in the Frazier case, that the date of valuation of the marital estate, the date upon which all of this is determined, is the date of dissolution of marriage. In this state, in this case, the date of dissolution is 625.04. So what we're valuing is what existed on 625.04. The only thing that existed at 625.04 was the 40-page text written by Mr. Shelton. Now, I will tell you in a trance that if somebody came up to Mr. Shelton today and said, Hey, I want to buy that 40-page text, I want to print it, I want to distribute it, every penny that that 40-page text generated would be marital property. What the Shelton, excuse me, what the Mathis case says is when the dissolution of marriage is entered, property, you cannot approve marital property after the marriage is over. This court said the same thing in the Frazier case, which was decided years before and which was relied upon by Mathis. So the point of the matter is, Anarchist Agenda and Ten Commandments did not exist as of that date. Therefore, they cannot be marital property. That's what the Mathis case says. Now, the important part of this is you have to understand, in this case, royalties are paid for a prescribed property interest. The property interest for which royalties are paid is the copyright. Now, the petitioner tries to deny that. But if you look at the petitioner's brief, the petitioner's brief proves it. First, I'll direct you to page 37 of the petitioner's brief, the last paragraph on that page. She says, oh, and the post-dissolution income is the marital property that's divided. She says the copyright does not create or generate the income. She says the copyright protects the author and his assigned from unauthorized infringement. And what generates the income is the sale of the literary work. My question is, what do you sell when you sell a literary work? You sell the rights generated and coming into existence by reason of the Copyright Act. We know that because the California court, in the case of in-ray marriage of work, answered precisely that question. It's quoted on the first page of our reply brief. The California court says the Copyright Act grants to the copyright holder exclusive rights over his own work. It says that the copyright protects that work from infringement and imposes penalties on those who would infringe. It then says the copyright holder may grant a license to others to make use of the copyrighted work customarily in exchange for the copyright holder's right to receive royalties. You cannot segregate the right to receive royalties from the property interest in the copyright. If you don't believe that, look at the petitioner's brief at page 34. And if you look at the petitioner's brief at page 34, they have a citation from the Turner Treatise from the Monslow case. What petitioner says is that if a patent, intellectual property, is not considered property, there's no sharing of the royalties. It then says, thus, if there is any possibility that future benefits will be received by a patent or copyright, they should be treated as property. So it's axiomatic that there's no royalty absent the copyright. And you cannot classify the royalty as marital property until you classify the copyright presumed to which it's paid. Because it's the fundamental property interest that generates the money. The money, and this is where the trial court, I think, made an error when it tried to somehow or the other segregate the payment of royalties from the copyright. Because the fundamental point here is we have three separate, independent, distinct pieces of property. We have a 40-page text generated in November of 2003. We have a gender, which didn't exist until September of 2004. And we have 10 commandments then, which didn't exist until sometime in mid to late 2005. So each has their own separate and distinct copyright. Each is its own separate and distinct piece of property. Each is subject to its own separate and distinct classification as to whether it's marital or non-marital. And in this case, the thing we have to keep in mind is that when we talk about non-marital, we're talking about post-marital. So these things, the Mathis court tells us, I think, very clearly, that these things which do not exist as of the date of dissolution of marriage cannot be marital property. So if it's a draft, it's not a final copyright. It's not part of the marital estate. That's correct. And to the extent, Judge, if you wanted to take it to the next level and you wanted to try to say somehow that it was, what's its value as the date of dissolution? Because the Mathis court says that's the valuation date you have to look at. So the valuation would be zero because it didn't exist. Of course. Because it doesn't exist. And the answer to that has to be true when you look at Section 101 of the Act because Section 101 of the Copyright Act is the section that says all these interim versions are separate, different, distinct works. But that Act says they all have value. The derivative section of the Copyright Act says each and every one has value. So whether it's a draft, whether it's a final version, whether it's an abridgment, each has the right to be copyrighted, right? Yes, ma'am. And each has value. And it's up to the court then, theoretically, to consider what that value is. And here's what I submit to you the answer to that question is look at the Monslo case. The Monslo case answers that question. In Monslo, the patent was perfected during marriage. It was the invention was made, it was completed, it was registered. No money had ever been paid and nobody had ever offered a penny for it. What does the court do? The court takes that patent, which had no identifiable value, and says, OK, if, as, and when it generates money, we'll divide it. So my response to Your Honor's question is the value as of that date is if, as, and when somebody comes along and wants to publish that 40-page text or wants to publish some intervening version that didn't exist, that wasn't the final book, then we can share that value in the way the Monslo court did by setting some hypothetical percentage. What you can do is to assume that the work that didn't exist at the date of dissolution, somehow or the other, the petitioner is entitled to share in the post-dissolution efforts that created, particularly when those post-dissolution efforts are another person, Ms. Quinn, not the post-dissolution efforts of Respondent. It seems, though, in the court's order that the judge attempted to make some distinction between when Mr. Shelton stopped, and he has November 2003, although the briefs have it much later, the court has it at November 2003, and then says she picked up and says that the November 2003 draft, if you will, was then integrated into this work. That's not true. That's what the order appears to say. But factually, that's not true. OK, but you would agree that the order says. Well, what the court says, and I don't agree that the court says that. What the court said was, rather than that, the court said, well, whatever contribution the Respondent was, and the court didn't distinguish about what that is, he finished it in November of 2003. So whatever was done in November of 2003 was his quote-unquote contribution. What the court acknowledges is essentially after November of 2003, Danny Shelton didn't do anything. That everything that was done after that time was misplaced. The point is what Danny Shelton did in November, ending November of 2003, was a separate, distinct, and independent work, and not a part of the works that came later. Indeed, if you look at Ms. Flynn's testimony and you look at the statement of facts in the brief, it's clear that somewhere between little and none of the actual language in the 40-page brief were ever used for anything. The most that was ever used was perhaps some of the ideas, and under Section 102 of the Copyright Act, an idea is not proper. We believe the answer to the question is no, and that the trial court's ruling to the contrary should be reversed. Thank you, Counsel. May it please the Court, Counsel. My name is Kurt Beckus, and I represent the petitioner-appellee Linda Shelton. I'm aware, Your Honors, that this matter and the review or the answering of the certified question is de novo, but obviously we believe that Judge Lewis made the legally correct decision when he entered his order finding that these royalties were marital property. Judge Lewis was not only able to sort through all the copyright distraction issues in order to discern the real issue, we believe Judge Lewis understood the practical consequences of accepting the Respondent's theory of this case. Do you agree that the copyright did not exist at the time of the dissolution of marriage? Yes, sir, I do, but our position is that does not matter. We are not asking for the court to divide any interest in the copyright. We are asking the court to award the petitioner an equitable distribution or portion of that which was created by the personal efforts, skill, and energy of the spouse during the marriage. How does that impact the actual author, who is not the spouse? You mean Ms. Quinn? Yes. Well, that would be between the Respondent and Ms. Quinn, but the point is the law is clear that the personal effort of a spouse, personal skill, effort, and energy of a spouse expended during the marriage constitutes marital property, and the law is clear that any resulting economic benefit from a spouse's personal effort during the marriage is also marital property, even though those economic benefits are received after the divorce. So the draft had what was called tremendous potential. I think that was the language in the Monslow. That's correct, Your Honor. It had potential, but it didn't have completion. That's correct. Okay. And we maintain that a literary work does not have to be finished prior to the date of dissolution in order to constitute marital property. The Heinze Court did not hold that the literary work had to be finished. The Heinze Court commented that these works were actual tangible works, but if you read the decision closely, those comments were made to address the wife's argument that, well, these future royalty payments are analogous to contingent attorney fees and therefore speculative as to value. But we've also cited for the Court three other cases in our brief from other jurisdictions that clearly hold that a literary work doesn't have to be finished. It could be, as you stated, Your Honor, in a draft form. There's the Michael case that we cited for you, which is the case where the author, wife, spouse had a number of unfinished books, and the Court still awarded the husband in that case a share of the royalties because these unfinished books formed the foundation for the economic benefits. We cited for you the Zanes case. That's the case where the husband was the movie producer of the movie Amadeus. And in that case, the movie was nowhere near finished. They had filmed it and were in post-production. And even though those were the facts, the Court awarded the wife half of the economic benefits derived therefrom on the basis that it was the effort and the energy expended to some appreciable degree during the course of the marriage. We've cited for you the Hazard case that counsel mentioned. That was the case where a spouse had developed and created a medical device that at the time of the dissolution had, according to them, no marketable value. They had test-marketed that product. A patient had died during the test market, and they had to totally reboot. And there were modifications and improvements that had to be made before it could even generate economic benefits. But the Court still awarded a share of the economic benefits derived. And Your Honor, quite frankly, it would be unwise to create some hard and fast rule that the publication has to be finished. It begs the question of how finished it has to be. Can you have a text or a manuscript or a book and complete it all except for the last paragraph, come into the divorce court and claim that it's not property a week after the divorce, finish the book, have the final copyright come into existence, and claim that it's all non-marital property? That's the key problem with this case. If you accept the Respondent's theory in this case, you will turn the entire body of law that says personal efforts expended by a spouse during the marriage are as marital property and economic benefits derived therefrom are marital property even though they're received after the divorce. This is the Heinze case. This is the Dunn case. This is the Worth case. This is the Berry case. It's the Hazard case. This whole body of law will turn on your head if you say that it's not property until a final copyright vests because what can happen is a spouse can prepare the whole entire literary work, come into court and say, I'm sorry, it's not finished, Your Honor. There's no signed publication contract and the copyright's not going to vest for a week. That would be an unwise decision to make. It seems to me, though, that your argument and the question that we're being asked to resolve are different, and that's really my trouble here. The way this question is worded, it's making this presumption that the literary work, which was the subject of the contract, okay, because it says, is it marital property, there's this presumption in here that I'm having a lot of trouble with because you all are arguing pieces of it.  But that's not the question. What is the literary work that is the subject of the question? Who wrote the question? Did the judge write it or did one of you? There was a lot of wrangling between counsel as to the drafting of the question. A part of the question is does there have to be a signed publication agreement in place during the marriage in order for the property interest that was created to be marital property? And we submit that it is not necessary to have a signed publication agreement. But my problem here is it seems to me that the cases you cite, there's no problem in evaluating the partial. The cases that you have cited, they were able to evaluate what piece or how much, not 50%, but less than 50%, perhaps. Right? Yes. And so if you have a draft that becomes a derivative work that's published, it seems that the court, if it is marital property, could easily do the same weighing, how much of this was really personal effort, time, et cetera, that evolved into this book. That could happen. I believe that's right, and I believe that goes back to your question. Can a book that starts premarital, can it be partly marital? Right. I believe the answer to that is yes. But this question is what I'm having trouble with because I don't know what the literary work is. It seems to me that the literary work as phrased is the one that was under contract, and there were two under contract. Well, let's clear that up. Counsel would like you to believe that what we're asking for is a revision of the copyright, but we're not. The property interest in this case that was contributed by the respondent and created by him by his personal efforts during the course of the marriage is the manuscript. And I disagree with counsel that none of that ended up in the final versions of the book. If you look at the supplemental supporting record, we provided you with exhibits that are highlighted that show you what went into the book. And they went into all the books, the Antichrist Agenda and the Ten Commandments, all editions of that. In addition to the manuscript, Your Honor, that was contributed, Chapters 1 through 4 of the Antichrist Agenda were written by Quinn before the date of dissolution, and I disagree with counsel as to when he said these were written. Chapters 1 through 4 were written prior to the dissolution of marriage by Quinn for the respondent in his name as his agent. Chapters 1 through 4, as they existed on the date of dissolution, almost exactly ended up in the final published version of the Antichrist Agenda. That same text ended up in the Ten Commandments twice removed, and that same text ended up in the third book, Never Forget God's Word. The point the trial court was making is, look, personal effort expended by a spouse during the marriage is marital property. Economic benefits derived from that personal effort is marital property. In this case, it's undisputed that what the respondent contributed to this literary work was completed before the date of the dissolution. That was his contribution, and he received economic benefits from his contribution. So the court held, since his whole contribution to this was done prior to the dissolution, everything that he received in exchange is marital property. And it does not matter all this argument about the copyrights and when the copyrights came into existence. All that would only be relevant if we were asking for a division of the copyrights, but we're not. We're simply asking for a equitable division of the economic proceeds that were derived from the personal effort of a spouse. It's not the copyright that generates the economic benefits here. Let's be clear about that. A copyright doesn't generate income. It's the sale of the literary work that generates the income. With respect to the certified question, what the court wanted to know is, do you need to have a signed publication agreement before a literary work that's contributed, created by the personal effort of a spouse during the marriage, can be determined to be marital property? And the answer to that is no. You do not need to finish the publication before the date of dissolution for that literary work to constitute marital property. The publication agreement also doesn't need to be signed. The publication agreement, likewise, doesn't create any economic benefit. It's the sale of the books that creates the economic benefit. Counsel indicated in their brief that the central and ultimate point of their appeal is this, the property interest for which the economic benefits are paid is the copyright. Translated, that argument means it's the property interest that creates the economic benefits or, I'm sorry, the property interest that creates the economic benefits is the copyright. If the copyright comes into existence after the date of dissolution, any resulting economic benefits, therefore, can only exist after the date of the dissolution. According to their theory, if the copyright comes into existence after the date of dissolution, the economic benefits just arise instantaneously after that point. They have to be non-marital. But I'm telling you, while that's a clever argument, if they accept it, you're going to turn a well-established body of law on its head. On the other hand, they say that when you hit the print button, the copyright exists. Do you agree with that, too? That's true, and there is a copyright with respect to the manuscript when Respondent's manuscript was completed. But we're not asking the court to divide that copyright, or we're not asking the court to address the ownership of that. So in this particular case, there could be four copyrights, but you're not asking for copyrights? No, we're not asking for any ownership. But there could be four. There could be the draft, there could be the antichrist, there could be the abridgment, and then there could be the fourth one. Yes, ma'am. And all of them have the same material in them. Well, and quite frankly, we don't care what the court does with the copyrights. It's not the copyrights that we're asking the court to divide. The copyright is separate from the economic benefits that are derived from the personal effort of a spouse during the marriage. The Rod Reid case makes that clear, and the Berry case makes that clear. Both these cases said you can award the author's spouse the copyright. Under Section 106, the author's entitled to those five enumerated bundle of rights. But the economic benefits derived from the underlying literary work that was created by the personal efforts of a spouse, the state divorce court can award those benefits to the marital estate and then divide it in an equitable manner. That's what Rod Reid and Berry stand for. Counsel, I'll talk to you about the Mathis case. I suggest to you that the Mathis case should not impact your decision in this matter at all. The Mathis case is a recently issued Supreme Court opinion, and it deals with the date of valuation, and they finally decided the date of valuation should be the day of dissolution. But case law is clear in that those cases are decided in our brief that when a property interest, which I described to you earlier as the manuscript in the chapters one through four of each of those three books, when it's difficult to value but it has intrinsic value for its state of development, the proper way to proceed is to divide those royalties in economic benefits if, as, and when they are received. And the Mathis court doesn't prohibit a state divorce court from dividing future royalties in that way. All of the cases that we cite were cases where the court did not endeavor to value the literary work or the product on the date of the dissolution, but instead adopted this approach, the if, as, and when approach. So what value did this draft have at the time of the date of dissolution? I would concede that it would be difficult to value it. I haven't been allowed to conduct any discovery as to that, Judge, but let's assume for the sake of me answering your question that it is difficult to value. The case law says that when you have a property interest, which we do, that has intrinsic value for its stage of development, which it does, it's appropriate to make an award based on a percentage method. The Monslow case is a case that you should look at for that. You should look at what Turner, the matrimonial scholar, says about that. You should look at Heinze. Heinze did not purport to value any literary work at the time of dissolution. They knew that they had a valuable property interest, and they divided it percentage-wise if and when those royalties were received. But those books were written during the marriage. There was no dispute about that. In fact, the one that they did dispute, they threw out, right, in Heinze? Yes. There were originally six. The ultimate decision involved four, and there was a 1990 book that the court discussed, and I'm glad you asked that question because I want to clear something up about the 1990 book. Counsel says the 1990 book in Heinze is analogous to the Antichrist agenda, and that's not true. If you read that opinion closely, that 1990 book, the writing started after the date of the dissolution. That's distinguishable from this case, where on the date of dissolution,  the text of which was incorporated into all of the books. Well, the opinion actually says that the 1990 book was written after the dissolution. Yes. It makes that very clear. But counsel would like you to believe that the 1990 book is like what we had, the property interest, the manuscript in the first four chapters. The difference is we were well along in the writing of the Antichrist agenda on the day of the dissolution. Do you think that there would be experts in the field of literary works and publications who could estimate the value of this draft? Do you think an expert would have to be hired, and do you think there is such an expert? I mean, how are you going to, as Justice Wexton indicated, how are you going to go about this? Well, of course, in hindsight, we know that these literary works created significant royalties. I will say that. I believe that the trial court would adopt the view of Heinze and the body of law that I've discussed before, where you can acknowledge that the valuation is difficult, but if you have a property right that has intrinsic value and tremendous potential, you don't necessarily have to nail down a specific dollar figure. You can say we're going to award the spouses a percentage interest in the royalties if and when they are received. If you don't do that, Your Honor, like Turner indicated in Monslow, you run the risk of unfairly depriving the non-offer spouse of the fruits of the shared enterprise of marriage. I'm not asking that. How do you come up with the percentage is what we're asking. Was it 10 percent, 15, 25? Well, of course, that would be left to the trial court's discretion after hearing the evidence. But you have the burden. Yes. So what would you do? Do you think there's experts out there? In the Heinze case, what happened is the author testified that they're going to have to do some promotion of the book, make some appearances and so forth. Heinze actually ended up awarding the author spouse 75 percent and the non-author spouse 25 percent. They took into account personal efforts that may have to be expended by the spouse after the marriage to promote and sell the book. And that question, I believe, would be left to the trial court's discretion. Thank you. Counsel? I find it interesting, Your Honor, that counsel never asked, never answered the basic question. When you sell a literary work, what do you sell, if not the property interest represented by the copyright? The copyright is the property interest. It has, the work has no value absent the copyright. That's clear from even the cases he's cited. He does not address it. He tries to say again to you that these cases he cites somehow says you can value these incomplete and nebulous works. He referred to the Louisiana case. As I've indicated, the Louisiana case relies on a principle that's anathema to Illinois law. Secondly, he cites the Zanz case from California. Here's what he forgot to tell you about the Zanz case, that while the filming had been complete, the movie had not been completed in terms of post-production work, the contract which allocated the benefits to the husband was executed during the marriage and before the movie was finished. That's like Hines. The right to receive the money arose during the marriage. He didn't tell you that part. That's why that case doesn't matter. What he continues to try to assert is the fiction that somehow this 40-page text that Mr. Shelton wrote during the marriage was a part of something else, and it wasn't. Do you disagree with his statement about chapters 1 through 4? Absolutely. So chapters 1 through 4 are not the same. They're not the same. They were rewritten after the marriage first. Secondly, Mr. Shelton didn't write them. Thirdly, Ms. Quinn was never, under any cognizable situation, Mr. Shelton's agent for doing these. Regardless of that, was chapters 1 through 4, if I look at chapters 1 through 4 of what Mr. Shelton wrote, I'm not going to see anything like that in the subsequent books. Mr. Shelton didn't write chapters. No, that wasn't my question. Are they going to look the same? No, ma'am, they're not. Totally different. Mr. Shelton wrote 40 pages. That's all he wrote. And those 40 pages are nowhere incorporated. The only thing that he referred to, and I want you to look at the exhibits on this, is there was material quoted, not original Mr. Shelton, but quoted by Mr. Shelton from other sources in his 40 pages. The same material from other sources were quoted by Ms. Quinn at various parts of her books. But those are not materials that were original with Mr. Shelton. Those were materials available to anybody in public. Yeah, but did Mr. Shelton write them is my question. Mr. Shelton... Regardless of who said what, did he write them and put them together? Now, I'm... The first four chapters... Mr. Shelton did not write the first four chapters. Okay. Ms. Quinn wrote the first four chapters. Mr. Shelton never wrote a word about any of this after November of 2003. The point of this, when you talk about Mr. Shelton's quote-unquote efforts, Mr. Shelton's efforts end with the writing of that 40-page text. That 40-page text, which was intended to be a pamphlet in its own right, is a separate, independent, and distinct work, having its own copyright, having its own ability to be published separately and distinctly. There is nothing, nothing, nothing that Mr. Shelton did or wrote after November of 2003 which has anything to do with this case. The point of the matter is to say, as counsel asserts, that somehow whether Mathis doesn't matter then means that all the post-marital efforts and Mr. Shelton's post-marital efforts were primarily a promotion. I always have a hard time telling the Supreme Court that something doesn't matter, that they decided, which is Mathis, right? Exactly. That's exactly the point, Judge. For better or for worse, Mathis has said that the post-marital efforts of the spouse don't come in here. The post-marital property acquired, however it was acquired, don't come in here. And the effort that Mr. Shelton made after the marriage was primarily a promotion because there's no question on this record Mr. Shelton never wrote a word of this. So the point of the matter is you cannot conclude this case without determining what the property interest is for which royalties were paid. The property interest is the copyright. You cannot determine that the royalties paid for the copyright are divisible in the marriage without first classifying the property interest for which they're paid under the classification provisions of sections 503A and B. So the answer to the question must be no. Thank you. Thank you, Ellis.